## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DWAYNE THORPE,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILA., et al.,** | : | **No. 19-5094** |
| *Defendants* | : | |

### MEMORANDUM

PRATTER, J.                                                         AUGUST 31, 2020

Dwayne Thorpe was incarcerated for nearly eleven years for a murder that he did not

commit.  He alleges that various Philadelphia police officers—Det. James Pitts, Det. Timothy

Scally, Det. Angela Gaines, Det. Henry Glenn, Det. John Cummings, Sgt. Frank Hayes, Sgt. Ron

McClane, and Lt. Philip Riehl—and the City played a role in advancing the investigatory

misconduct that led to his wrongful conviction.  Through the filing of two motions to dismiss,[1] the

Court has been asked to dismiss all claims against Defendants Gaines, Glenn, Cummings, Hayes,

Riehl, and McClane; the Fourteenth Amendment malicious prosecution claim as to Det. Scally;

and the Fourteenth Amendment and state-law malicious prosecution claims with respect to the

City.

For the reasons discussed below, the Court dismisses (i) Mr. Thorpe's failure-to-intervene

claim as to Defendants Gaines, Glenn, Cummings, Hayes, Riehl, and McClane; (ii) the Fourteenth

---

[1]     Defendants Gaines, Glenn, Hayes, McClane, Riehl, Scally, and the City collectively submitted one
motion, and Beverly Cummings submitted another motion.  Beverly Cummings is the legal representative
of the estate of her late husband, John Cummings.  This Memorandum refers to John Cummings and
Beverly Cummings, in her legal capacity as a representative of the estate and a named party in this action,
collectively as "Det. Cummings."

Amendment malicious prosecution claim against all properly moving defendants;[2] (iii) the state malicious prosecution claim with respect to the City; and (iv) the fabrication-of-evidence claim as to Det. Gaines.

**BACKGROUND**

## I.    Procedural Background

Mr. Thorpe initiated this action in October 2019 against the City and Defendants Pitts, Scally, Gaines, Glenn, Cummings, Hayes, McClane, and Riehl, all of whom were Philadelphia police officers associated with the homicide investigation at issue.    The City and Defendants Gaines, Glenn, Hayes, McClane, Riehl, and Scally filed a motion to partially dismiss Mr. Thorpe's initial complaint for a failure to state a claim.    Shortly thereafter, Mr. Thorpe submitted a consent motion to file an amended complaint to name Beverly Cummings as a defendant, in her capacity as the personal representative of John Cummings' estate.    The Court granted the consent motion and deemed moot the initial motion to dismiss.

Mr. Thorpe amended complaint pleads the following causes of action:

- **Count I:** 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence and Withholding Material Exculpatory and Impeachment Evidence against all individual defendants;

- **Count II:** 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments against all individual defendants;

- **Count III:** 42 U.S.C. § 1983 Civil Rights Conspiracy against all individual defendants;

- **Count IV:** 42 U.S.C. § 1983 Failure to Intervene against all individual defendants;

---

[2]      As discussed below, *see infra* Discussion § IV.B, the City argues that the Court should dismiss a Fourteenth Amendment malicious prosecution claim against it, even though Mr. Thorpe did not actually allege such a claim as to the City.    Accordingly, the Court deems moot the motion to dismiss filed by Defendants Gaines, Glenn, Cummings, Hayes, Riehl, McClane, Scally, and the City only to the extent it advances this argument.    Even if Mr. Thorpe did bring such a claim against the City, it would fail for the reasons discussed below.

2

- **Count V:** 42 U.S.C. § 1983 Supervisory Liability claim against Sgt. Hayes, Sgt. McClane, and Lt. Riehl;

- **Count VI:** 42 U.S.C. § 1983 Municipal Liability claim against the City; and

- **Count VII:** Malicious Prosecution under Pennsylvania state law against all defendants.

In February 2020, the City and Defendants Gaines, Glenn, Hayes, McClane, Riehl, and Scally again moved to partially dismiss the amended complaint. Det. Cummings also filed a motion to dismiss in April 2020. Collectively, the moving defendants request the Court to dismiss (1) all claims against Defendants Gaines, Glenn, Cummings, Hayes, McClane, and Riehl; (2) the Fourteenth Amendment malicious prosecution claim with respect to Det. Scally; and (iii) the Fourteenth Amendment and state-law malicious prosecution claims as to the City. In his response in opposition to the first motion, Mr. Thorpe agreed that his state malicious prosecution claim as to the City should be dismissed. The Court ordered the parties to supplement their briefing regarding their qualified immunity arguments and held oral argument for both motions. As requested during oral argument, the Court also permitted Mr. Thorpe an opportunity to submit supplemental briefing regarding the moving individual defendants' immunity argument as to the state malicious prosecution claim, which was first articulated in Defendants' supplemental briefing.

Rather than joining either motion to dismiss, Det. Pitts filed an answer to the amended complaint.

## II.   Factual Background[3]

### A. The Shooting of Hamin Span

On July 4, 2008, around 11:00 a.m., thirty-year-old Hamin Span and his fifteen-year-old

---

[3]      In ruling on these motions to dismiss, the Court must accept the facts presented in the amended complaint in the light most favorable to Mr. Thorpe and "accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994).

3

brother, Nyfeese Robinson, were running errands in the Kensington neighborhood of Philadelphia in preparation for an Independence Day block party. On their way to a store, a teenage young man rode up to the pair on a bicycle and shouted to Mr. Span that he wanted "to continue a fight the two had had the day before." Am. Compl. at ¶ 29 (Doc. No. 33). After Mr. Span confronted and walked toward the teen, the teen retreated inside a home. The brothers then walked to the store and conducted their errand. On their way home, the teen again rode his bicycle toward the pair and began shouting to Mr. Span from across the street. The teen pulled out a .32 caliber handgun and fired several shots at the brothers, shooting Mr. Span multiple times. Mr. Span died shortly after the police arrived at the scene. At the time of the shooting, Mr. Thorpe was in a different neighborhood in Philadelphia preparing for another Independence Day block party.

### B. Det. Pitts' Pattern of Investigative Misconduct

Mr. Thorpe alleges that the lead detective assigned to the Span shooting, Det. Pitts, engaged in a pattern of fabricating and coercing false statements from witnesses, typically by using physical harm or threats. From early 2007 to late 2013, Det. Pitts engaged in investigative misconduct in at least twelve other investigations or incidents, at least two of which having occurred before this shooting.

### C. The Span Shooting Investigation

#### 1. Police Officers Arrive at the Scene

The police officers that arrived at the scene identified three potential eyewitnesses to the shooting, including Mr. Robinson. The eyewitnesses all provided the same description of the shooter: "18-years-old, 5'8" Black male with a thin build, wearing a white T-shirt, blue jean shorts, and gray cap, and riding an aqua-colored bicycle." *Id.* at ¶ 36. Sgt. Hayes and homicide detectives arrived at the crime scene around 1:00 p.m. After conducting neighborhood interviews, the police

4

learned that John Bytheway observed Mr. Span arguing with a young Black teenager who rode a bicycle past Mr. Span's house.

### 2. Mr. Robinson's First Interview

The police officers transported Mr. Robinson to the Homicide Unit where Dets. Pitts, Scally, and Cummings interviewed him. The detectives spoke to Mr. Robinson for a period of time before beginning to type Mr. Robinson's statement, allegedly intentionally failing to record the full interview. According to Mr. Thorpe, the detectives did not ask and/or failed to record answers to standard interview questions, such as the age of and height of the shooter, whether the shooter had any distinctive features, and what Mr. Robinson knew about the dispute he witnessed between Mr. Span and the shooter. Mr. Robinson's statement described the male shooter as "light-brown skin, thin, white tee shirt and a brown hat[.]" *Id.* at ¶ 43.

Dets. Pitts, Scally, and Cummings also showed Mr. Robinson a photo array, but Mr. Robinson was unable to make an identification. The detectives intentionally failed to record any information concerning the photo array. Upon information and belief, the detectives failed to preserve and/or destroyed information concerning the photo array "because they believed it would be harmful to an eventual prosecution." *Id.* at ¶ 46.

### 3. The Third-Floor Rear Apartment

Det. Glenn reported that Mr. Robinson identified 3045 Frankford Avenue as the building he had seen the shooter enter, which was a complex with separate apartment units. Upon information and belief, Dets. Pitts, Glenn, and Cummings misrepresented that residents identified the third-floor rear apartment as the shooter's residence. Based on this misrepresentation, the officers obtained a warrant to search the third-floor rear apartment. On the day of the shooting, Dets. Pitts, Scally, Cummings, Gaines, and Glenn and Sgt. Hayes executed the warrant and

5

recovered various items, including a .380 caliber handgun and a photograph of two Black young men, one of which being Mr. Thorpe. According to Mr. Thorpe, he did not own any of the physical evidence recovered, nor was any of the physical evidence connected to the shooting.

### 4. Statement from Senetra Stones

Lt. Riehl and Sgt. McClane directed Det. Pitts to interview Senetra Stones, the leaseholder of the third-floor rear apartment four days after the shooting. Ms. Stones explained that she previously lived in the apartment with her then-boyfriend, Allen Chamberlain, but that she no longer lived there. She identified one of the two men in the photograph as Mr. Thorpe. Dets. Pitts and Scally then showed Ms. Stones a blurry surveillance video from a grocery store in an attempt to have her identify the individual riding a bicycle in the video. Ms. Stones told Dets. Pitts and Scally that she was unable to make an identification and that she had no information about the shooting or the person in the video. Dets. Pitts and Scally allegedly held Ms. Stones at the police station for hours, pressuring her to tell them that Mr. Thorpe was the person in the surveillance video. Det. Pitts repeatedly showed Ms. Stones the photograph and insisted that Mr. Thorpe was the shooter. After Ms. Stones stated that Mr. Thorpe was not the person in the video, Det. Pitts threatened to take away her children and to arrest her for items found in the apartment if she did not identify Mr. Thorpe as the person in the video. Dets. Pitts and Scally then wrote a question-and-answer style statement to make it appear as though Ms. Stones voluntarily stated that the individual in the surveillance video looked like Mr. Thorpe. Ms. Stones did not testify at trial.

### 5. Statement from Allen Chamberlain

The next day, Sgt. McClane and Lt. Riehl directed Det. Pitts to interview Mr. Chamberlain. Although Mr. Chamberlain denied any knowledge of the murder, Det. Pitts allegedly coerced Mr. Chamberlain to implicate Mr. Thorpe. Det. Pitts punched Mr. Chamberlain in the stomach,

6

threatened to charge Mr. Chamberlain with murder, and, upon discovering that Mr. Chamberlain's infant son's mother recently passed away, threatened to call the Department of Human Services to have his son taken away if he did not comply. Mr. Chamberlain acquiesced after the last threat. Det. Pitts drafted a fabricated question-and-answer style statement falsely suggesting that Mr. Chamberlain communicated that he interacted with Mr. Thorpe inside the apartment shortly before the murder. The false statement explained that Mr. Thorpe described a dispute with someone on the block concerning a drug sale and implied that Mr. Thorpe would use a gun to take care of the problem. The statement also states that Mr. Chamberlain saw two guns inside the apartment, one of which being either a .25 or .32 caliber gun.

### 6. Statement from Mr. Robinson

The next day, Dets. Pitts and Scally interviewed Mr. Robinson for a second time. Det. Pitts allegedly used coercion, suggestion, and/or other impermissible tactics to induce Mr. Robinson to identify Mr. Thorpe in a photo array and "fed [Mr.] Robinson details" in order to have him describe the shooter inconsistently from his initial statement and in a way that would inculpate Mr. Thorpe. *Id.* at ¶ 82. Dets. Pitts and Scally did not report that they coerced Mr. Robinson to identify Mr. Thorpe.

### 7. Identification from Tammy Gault

Because Tammy Gault witnessed the shooting while waiting for the bus, she was interviewed at the Homicide Unit on the day of the shooting. Det. Scally typed another question-and-answer style report which included various statements that Ms. Gault allegedly never made. Dets. Pitts and Scally presented the same photo arrays that had been shown to Mr. Robinson to Ms. Gault. Although Ms. Gault repeatedly told them that she had not seen the shooter's face, Dets. Pitts and Scally continued to direct and pressure her into identifying Mr. Thorpe. Due to this

7

coercion, Ms. Gault circled and signed Mr. Thorpe's photo. Ms. Gault did not appear at trial.

### 8. John Bytheway

After conducting neighborhood interviews on the day of the shooting, the officers learned that John Bytheway observed on the day before the shooting Mr. Span arguing with a Black man in his late teens who was riding a bicycle. Det. Gaines interviewed Mr. Bytheway at the Homicide Unit. Dets. Pitts, Scally and/or Gaines either omitted the fact that they presented a photo array to Mr. Bytheway and he did not identify Mr. Thorpe or they never presented the photo array because they knew he would not identify Mr. Thorpe.

### 9. Gary McKeen

Gary McKeen also saw the shooter flee on the day of the shooting. Dets. Pitts and/or Scally interviewed Mr. McKeen at the Homicide Unit.   According to Mr. Thorpe, Dets. Pitts and/or Scally intentionally omitted the photo array from reports or never presented a photo array to Mr. McKeen. Mr. McKeen was not called to testify at trial.

### 10. Physical Evidence

Mr. Thorpe alleges that the individual defendants either failed to take a number of basic investigative steps during the investigation and that supervisors Sgt. Hayes, Sgt. McClane, and Lt. Riehl knowingly failed to ensure that these steps occurred, or, alternatively, that Dets. Pitts and Scally failed to report exculpatory results of any investigate steps that were taken. For instance, Dets. Pitts and Scally either did not try to recover fingerprints and/or DNA from the .32 caliber and/or failed to report that they had done so. Moreover, the identification of the aqua bicycle that had been described by multiple witnesses was never recovered and/or Dets. Pitts and Scally failed to report exculpatory results of investigative steps taken to find the bicycle or determine its owner. Dets. Pitts and Scally also failed to collect and/or analyze basic forensic information to determine

8

the true identity of the apartment's occupants and failed to investigate and/or record efforts to investigate individuals associated with the apartment.[4]

11. Supervision of Lt. Riehl, Sgt. McClane, and Sgt. Hayes

. Lt. Riehl, Sgt. McClane, and Sgt. Hayes supervised the activity of the defendant detectives at all times during the Span investigation. Upon information and belief, the three were aware of the other defendants' investigatory misconduct throughout this investigation and either affirmatively condoned or failed to prevent, address, or report it.[5]

## D. Mr. Thorpe's Trial and Conviction

Mr. Thorpe alleges that the only trial evidence supporting his guilty verdict was tainted by Defendants' misconduct. Mr. Robinson was the only witness to identify Mr. Thorpe as the shooter at trial, which Mr. Thorpe asserts was a product of improper suggestion. Mr. Robinson also presented a fabricated claim that the shooter stated that he was twenty-five years old, the same age as Mr. Thorpe. Although Mr. Chamberlain's fabricated and coerced statement was presented at trial, Mr. Chamberlain truthfully testified that the statement he signed was false and that he only signed it because Det. Pitts coerced him. Mr. Thorpe presented four alibi witnesses who testified that Mr. Thorpe was at another block party at the time of the shooting. According to Mr. Thorpe, the jury convicted him based on Mr. Robinson's in-court identification and Mr. Chamberlain's statement. Mr. Thorpe was sentenced to life imprisonment.

---

[4]     The City points out that some of Mr. Thorpe's allegations appear as though they may be attempting to advance a "failure-to-investigate" claim. *See Thomas v. City of Phila.*, 290 F. Supp. 3d 371, 386 (E.D. Pa. 2018) (declining to affirmatively recognize an independent cause of action for a failure to investigate). At oral argument, Mr. Thorpe's counsel confirmed that he is not advancing such a claim in this action.

[5]     More specific allegations regarding the supervisory defendants are articulated above.

9

### E. Mr. Thorpe's Exoneration

In November 2013, the *Philadelphia Daily News* published an article detailing how three murder prosecutions handled by Det. Pitts collapsed amidst accusations that he had coerced false statements by using threats and physical violence. In 2015, Mr. Thorpe filed a petition for a new trial under the Post-Conviction Relief Act. Mr. Thorpe was granted a new hearing to present evidence concerning Det. Pitts' reputation for using coercive actions in 2016. At the hearing, ten individuals testified that they experienced instances of coercion and fabrication involving Det. Pitts, and that these coercive interrogations took place throughout the majority of Det. Pitts' career in the Homicide Unit. In November 2017, the presiding judge vacated Mr. Thorpe's convictions and ordered a new trial. The Conviction Integrity Unit of the Philadelphia County District Attorney's Office undertook a reinvestigation into Mr. Thorpe's case. Upon the Conviction Integrity Unit's recommendation, the District Attorney's Office dismissed the charges against Mr. Thorpe in March 2019. Mr. Thorpe was released from custody after nearly eleven years of incarceration.

## LEGAL STANDARDS

### I.    Rule 12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). However, "to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted) (alteration in original).

10

To survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (citation and quotations omitted).

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *see also Twombly*, 550 U.S. at 555 (stating that courts must "assum[e] that all the allegations in the complaint are true (even if doubtful in fact)").  Also, the Court must accept as true all reasonable inferences emanating from the allegations and view those facts and inferences in the light most favorable to the nonmoving party. *See Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989); *see also Revell v. Port Auth. of N. Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010).

That admonition does not demand that the Court ignore or discount reality. The Court "need not accept as true unsupported conclusions and unwarranted inferences." *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183-84 (3d Cir. 2000) (citations and internal quotation marks omitted).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (explaining that a court need not accept a plaintiff's "bald assertions" or "legal conclusions") (citations omitted).  If a claim "is

11

vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

## II.   Qualified Immunity

The doctrine of qualified immunity has long "protect[ed] government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Because qualified immunity results in "immunity from suit rather than a mere defense to liability," *Pearson*, 555 U.S. at 231, qualified immunity inquiries "must be resolved at the earliest possible stage of the litigation[,]" *George v. Rehiel*, 738 F.3d 562, 571 (3d Cir. 2013) (quoting *Miller v. Clinton Cty.*, 544 F.3d 542, 547 (3d Cir. 2008)).

"At the pleading stage, 'qualified immunity will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint.'" *Martin-McFarlane v. City of Phila.*, 299 F. Supp. 3d 658, 668 (E.D. Pa. 2017) (quoting *Thomas v. Indep. Twp.*, 463 F.3d 285, 291 (3d Cir. 2006)). "The burden of establishing qualified immunity falls to the official claiming it as a defense." *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 176 (3d Cir. 2011).

"In resolving questions of qualified immunity, 'courts engage in a two-pronged inquiry: (1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was 'clearly established' at the time of the official's conduct.'" *Bland v. City of Newark*, 900 F.3d 77, 83 (3d Cir. 2018) (quoting *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016)). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis" to tackle first. *Pearson*, 555 U.S. at 236.

12

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Recently, "the Supreme Court reiterated the 'longstanding principle that clearly established law should not be defined at a high level of generality,' but must instead 'be particularized to the facts of the case." *Bland*, 900 F.3d at 83 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam)). Although there need not be a "'case directly on point'" to define a clearly established right, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Therefore, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

## DISCUSSION

The moving defendants set forth a host of arguments in support of their request for the Court to dismiss numerous claims against them. The Court addresses each in turn.

### I.    Supervisory Liability Claim

Mr. Thorpe contends that Sgt. Hayes, Sgt. McClane, and Lt. Riehl are liable for their personal involvement in supervising their subordinates' alleged misconduct. A § 1983 claim based on supervisory liability cannot be based merely on respondeat superior or vicarious liability. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). "It is uncontested that a government official is liable only for his or her own conduct and accordingly must have had some sort of personal involvement in the alleged unconstitutional conduct." *Argueta v. U.S. Immigration and Customs Enforcement*, 643 F.3d 60, 71 (3d Cir. 2011). The Third Circuit Court of Appeals has recognized that "'there are two theories of supervisory liability, one under which supervisors can be liable if

they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be liable if they participated in violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations.'" *Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010)).   A plaintiff must plead allegations of a supervisor's personal involvement with particularity." *Round v. City of Phila.*, No. 19-3513, 2020 WL 2098089, at *11 (E.D. Pa. May 1, 2020) (citations omitted).

To allege that a supervisory defendant directed others to violate constitutional rights, a plaintiff "must allege a causal connection between the supervisor's direction and that violation, or, in other words, proximate causation." *Santiago*, 629 F.2d at 128.   "Proximate causation is established where the supervisor gave directions that the supervisor knew or should reasonably have known would cause others to deprive the plaintiff of [his] constitutional rights." *Id.* (internal quotation marks and citations omitted).

The supervisory defendants—Sgt. Hayes, Sgt. McClane, and Lt. Riehl—argue that the Court should dismiss Mr. Thorpe's supervisory liability claim because (1) it is not cognizable under § 1983, (2) Mr. Thorpe failed to plead a plausible supervisory liability claim, and (3) they are entitled to qualified immunity.   All three arguments fail.

### A.  Whether Mr. Thorpe's § 1983 Supervisory Liability Claim is Cognizable

First, the supervisory defendants argue that *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), rendered supervisory liability claims uncognizable under § 1983.   However, in nearly the same breadth, they also concede "that certain Third Circuit decisions have allowed supervisory liability claims to be made post-*Iqbal*, and that this Court is bound by Third Circuit decisions."   Def.'s Mem. in Supp. of Mot. to Dismiss at 5 (Doc. No. 34).

As other courts in this circuit have noted, "*Iqbal* did not abolish supervisory liability." *Burgos v. City of Phila.*, 270 F. Supp. 3d 788, 795 n. 20 (E.D. Pa. 2017); *see also Thomas v. Adams*, 55 F. Supp. 3d 552, 568 (D.N.J. 2014) ("*Iqbal* did not change any aspect of substantive law. Nor did *Iqbal* create a liability exception for the defendants fortunate to hold supervisory positions."). Even so, the Court would be remiss if it did not note that the Third Circuit Court of Appeals has acknowledged "that there exists 'uncertainty as to the viability and scope of supervisory liability' after the Supreme Court's decision in [*Iqbal*], arguably narrowed or abrogated the ability to find a supervisor liable for conduct of which he was merely aware but did not direct." *Williams v. Papi*, 714 F. App'x 128, 133 (3d Cir. 2017) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 n.8 (3d Cir. 2010)). However, the Third Circuit Court of Appeals has yet to squarely address the extent of *Iqbal*'s impact of supervisory liability theories based on knowledge of and acquiesce in a subordinate's violations. *Williams*, 714 F. App'x at 133; *see also Jennings-Fowler v. City of Scranton*, 680 F. App'x 112, 118 n.24 (3d Cir. 2017) ("To date, [the Third Circuit Court of Appeals] ha[s] refrained from answering the question of whether *Iqbal* eliminated—or at least narrowed the scope of—supervisory liability."). Rather, it continues to articulate the standard set forth above: that a government official can only be liable for his or her own conduct, that they accordingly must have some sort of personal involvement in the alleged violation, and that such involvement may be established by alleging that the supervisor "'participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations.'" *Williams*, 714 F. App'x at 133 (quoting *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)). As recently as 2017, the Third Circuit Court of Appeals has continued to refrain from deciding whether the knowledge and acquiescence theory of supervisory liability remains after the Supreme Court's determination

15

in *Iqbal*.[6]

Accordingly, district courts have continued to recognize § 1983 supervisory liability claims based on a knowledge and acquiescence theory even in the wake of *Iqbal*. *See, e.g.*, *Goodwin v. Pennridge Sch. Dist.*, 309 F. Supp. 3d 367, 380 (E.D. Pa. 2018) (finding that plaintiff sufficiently pleaded claims of supervisory liability based on knowledge and acquiescence of supervisory defendants); *see also Plouffe v. Cevallos*, No. 10-1502, 2012 WL 1994785, at *4 n.4 (E.D. Pa. June 1, 2012) ("Because the Third Circuit has not held that a plaintiff may no longer establish § 1983 liability based on a supervisor's knowledge of and acquiescence in a subordinate's constitutional violation, this Court will continue to apply the pre-*Iqbal* supervisory liability analysis."); *Robles v. Casey*, No. 10-2663, 2011 WL 2292286, at *2 n.2 (M.D. Pa. June 8, 2011) (noting that because the Third Circuit Court of Appeals "has declined to hold that a plaintiff may no longer establish liability under § 1983 based on a supervisor's knowledge of and acquiescence in a violation[,]" it "follow[ed] the other courts in [its] district that have continued to apply the Third Circuit's traditional supervisory liability analysis.").

Moreover, the Third Circuit Court of Appeals post-*Iqbal* has affirmed at least one district court's invocation of supervisory liability based on the supervisor's knowledge of and acquiescence in a subordinate's violations when considering conduct which occurred prior to the Supreme Court's issuance of *Iqbal* in May 2009. In *Zion v. Nassan*, 556 F. App'x 103 (3d Cir. 2014), the plaintiff pleaded that, despite being aware of a pattern of violent behavior by a subordinate, the supervisors did nothing to remedy the situation. *Id.* at 109. In affirming the

---

[6]     *See, e.g.*, *Williams*, 714 F. App'x at 133 ("As in our prior cases, we need not decide whether the knowledge and acquiescence theory survives *Iqbal*, because for those officers over whom we have jurisdiction, Mrs. Williams' claims fail even under that theory."); *Jennings-Fowler*, 680 F. App'x at 118 n.24 (refraining from determining whether this theory of § 1983 liability survives in the wake of *Iqbal* because the plaintiff's claims failed for other reasons).

16

district court's denial of the police officer's motion for judgment on the pleadings and assertion that they were entitled to qualified immunity, the Third Circuit Court of Appeals determined that "[a]t the time of the shooting [which occurred in March 2009], binding precedent held that a supervisor may be liable for his subordinate's constitutional violations if the supervisor had knowledge of and acquiesced in the violations.  Because the legal norms allegedly violated by the supervisory defendants were clearly established at the time of the challenged actions, we will affirm the District Court's judgment as to the supervisory defendants[.]" *Id.* Here, as in *Zion*, it was clearly established at the time that the Span shooting investigation began in 2008 that a supervisor could be liable for knowingly acquiescing in a subordinate's violations of an individual's constitutional rights.

Therefore, the Court rejects the City's argument that Mr. Thorpe's § 1983 supervisory liability claim is no longer cognizable in light of *Iqbal*.

## B.  Whether Mr. Thorpe Pleaded a Plausible Supervisory Liability Claim

The supervisory defendants alternatively argue that Mr. Thorpe failed to allege sufficient facts to plausibly set forth their supervisory liability.  In doing so, the supervisory defendants point to Mr. Thorpe's allegations that they "knew or should have known" of Det. Pitts' coercive conduct and that they "were aware of the other Defendants' investigatory misconduct and either affirmatively condoned it or took no action to prevent it."  Am. Compl. at ¶¶ 56, 109 (Doc. No. 33).

Mr. Thorpe counters that he also alleged various particular factual allegations which further demonstrate their supervisory liability.  For instance, Mr. Thorpe alleges that detectives under the supervisory defendants' watch (1) fabricated evidence to obtain a search warrant of the third-floor rear apartment; (2) coerced Ms. Stones and Mr. Chamberlain to sign fabricated statements falsely

inculpating Mr. Thorpe; (3) suggested to Mr. Robinson and Ms. Gault to identify Mr. Thorpe in a photo identification procedure; (4) fed multiple witnesses details which inculpated Mr. Thorpe; and (5) buried such misconduct and other exculpatory evidence, including evidence of photo identification procedures completed by Mounsiers Bytheway and McKeen. Mr. Thorpe further alleges that the detectives failed to take basic investigative steps which could have led to the true perpetrator, such as trying to recover fingerprints from the crime scene and searching for the shooter's bicycle.

According to the amended complaint, Sgt. McClane and Lt. Riehl also directed Det. Pitts to interview Ms. Stones and Mr. Chamberlain, even though they knew or should have known about Det. Pitts' pattern of fabricating and coercing witness statements. Mr. Thorpe also pleads that Sgt. Hayes actively participated in the homicide investigation by developing the theory that the shooting involved a neighborhood drug dispute and executing the search warrant of the third-floor rear apartment.

In *Wright v. City of Philadelphia*, 229 F. Supp. 3d 322 (E.D. Pa. 2017), this Court determined that allegations that a lead investigator "was responsible for overseeing the investigation and gathering the evidence obtained by other officers" were sufficient to draw the reasonable inference that he had actual knowledge of, or acquiesced in, the misconduct of the allegations detailed throughout the amended complaint. *Id.* at 338. The Court finds the allegations set forth here to be at least as plausible—if not more—as those advanced in *Wright* for purposes of pleading the supervisory defendants' knowledge of and acquiescence in a subordinate's conduct. Accordingly, the Court finds that the amended complaint contains sufficient factual allegations to "allow[] the court to draw the reasonable inference that the defendant[s are] liable for the misconduct alleged." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citing

18

*Iqbal*, 556 U.S. at 678).

## C. Assertion of Qualified Immunity

The supervisory defendants next argue that even if Mr. Thorpe pleaded a plausible supervisory liability claim, they are entitled to qualified immunity for two reasons. First, the supervisory defendants contend that *Iqbal* made it unclear to officers whether they could face a supervisory liability claim. Because *Iqbal* has yet to change the legal landscape concerning supervisory liability in this circuit, the Court rejects this argument. *See supra* Discussion § I.A.[7] Second, the supervisory defendants argue that no officer would clearly know that they violated a constitutional right by engaging in their alleged actions. In doing so, they essentially reiterate their arguments as to why they believe Mr. Thorpe alleged insufficient facts for the Court to plausibly infer that they had knowledge of and acquiesced in subordinates' various constitutional violations. Since 2004, it has been clearly established that a supervisor may be liable if he or she had knowledge of and acquiesced in or directed their subordinates' unconstitutional conduct. *See A.M.*, 372 F.3d at 586. As discussed further below, *see infra* Discussion § III.A, it was clear at the time at issue that the alleged subordinates' conduct violated various clearly established rights. The Court thus declines to determine that no reasonable officer would have known during the investigation and prosecution that they ought not to look the other way when faced with a subordinates' fabrication of evidence or the burying of such misconduct and other exculpatory evidence.

Therefore, Mr. Thorpe's supervisory liability claim against Lt. Riehl, Sgt McClane, and

---

[7]     *Iqbal* was not decided until ten months after the Span homicide investigation already commenced. The amended complaint does not reference when Mr. Thorpe's trial began, but it states that the jury convicted him in December 2009, seven months after *Iqbal* was decided. Although the trial may have commenced a few months after the Supreme Court decided *Iqbal*, some, if not most, of the alleged wrongful conduct certainly predated *Iqbal*.

Sgt. Hayes survives the supervisory defendants' motion to dismiss.

## II.    Failure-to-Intervene Claim

Defendants Gaines, Glenn, Cummings, Hayes, Riehl, and McClane request the Court to dismiss the failure-to-intervene claim against them. A police officer is liable under § 1983 when he "fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). "[A]n officer is only liable if there is a realistic and reasonable opportunity to intervene." *Id.* at 651. Moreover, a duty to intervene attaches only if the officer knew of and acquiesced in the unconstitutional treatment of the plaintiff. *See id.* (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1194 (3d Cir. 1995)).

The moving individual defendants aver that failure-to-intervene claims are almost exclusively brought against state actors who fail to intervene in the face of excessive force. They are unaware of any governing caselaw recognizing a failure-to-intervene claim in the context of the fabrication or withholding of evidence. Accordingly, they argue that even if a failure-to-intervene claim could exist in this context, they are entitled to qualified immunity because it was not clear in 2008 and 2009 that a police officer would know that they had an affirmative duty to intervene when confronted with the fabrication or withholding of evidence.

There is no doubt that the vast majority of failure-to-intervene claims involve a situation in which a state actor is present during the oftentimes short-lived moment in which another state actor wrongfully uses physical contact against an individual. This case, on the other hand, invites the Court to consider a potential ongoing duty and opportunity to intervene, which Mr. Thorpe contends exists up until the moment of conviction. Mr. Thorpe suggests that intervention could come in the form of ensuring that basic investigative steps were taken, a supervisor stopping an

20

investigation, or an officer reporting the fabrication of evidence to a prosecutor.

Mr. Thorpe's counsel conceded during oral argument that, to the best of her knowledge, there are no cases where the Third Circuit Court of Appeals entertains the proposition that the fabrication and withholding of evidence at issue would establish another's duty to intervene. Even so, she argued that any reasonable official would have been put on notice that he or she ought to have intervened to stop conduct which is violating an individual's constitutional rights. However, this line of reasoning runs the risk of defining the clearly established law "at a high level of generality," which the Supreme Court has longed instructed courts not to do. *Bland*, 900 F.3d at 83 (quoting *White*, 137 S. Ct. at 552). Mr. Thorpe's suggestion that such a duty to intervene exists for the entire duration of the investigation and prosecution—rather than the fleeting moment in time afforded an officer in the presence of unconstitutional physical action—exemplifies the heightened generality of the proposition. The Court declines to accept the position that precedent which made clear that an officer ought to intervene when observing a wrongful beating likewise equally places before the Court the question as to whether an officer must intervene when confronted with the conduct at issue here arguably "beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *Ashcroft*, 563 U.S. at 741).

In *Ekwunife v. City of Philadelphia*, 245 F. Supp. 3d 660 (E.D. Pa. 2017), the Court rejected a similar argument to the one Mr. Thorpe advances here. In that case, the defendants likewise pointed out that failure-to-intervene cases are nearly exclusively brought against state actors who fail to intervene in cases of alleged brutality, and that they were unaware of cases in this circuit holding a prosecutor liable for not intervening to correct false information used to arrest and detain an innocent individual. *Id.* at 672. There, the plaintiff retorted that if a court can find a state actor liable for failing to intervene in a police beating, it may also find a state actor liable for failing to

intervene to stop the fabrication of evidence used to charge and prosecute an innocent man. *Id.* at 672-73. The Court ultimately declined to rely upon out-of-circuit case law in which a failure to intervene claim was recognized in the context of unconstitutional interrogations. *Id.* at 672.[8]

Because it was not sufficiently clear that reasonable officers would have understood that failing to intervene when confronted with another's fabrication and withholding of evidence violated Mr. Thorpe's constitutional rights, the Court grants the moving individual defendants qualified immunity with respect to the failure-to-intervene claim.

## III. Fabrication-of-Evidence, *Brady*, Fourth Amendment Malicious Prosecution, and Civil Rights Conspiracy Claims

Defendants Gaines, Glenn, Cumming, Hayes, Riehl, and McClane assert that Mr. Thorpe failed to bring plausible fabrication-of-evidence, *Brady*, Fourth Amendment malicious prosecution, and civil rights conspiracy claims against them, or, alternatively, that they are entitled to qualified immunity with respect to these claims.

### A. Legal Standards for Claims

1. Fabrication-of-Evidence

Where a criminal defendant "has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under § 1983 based on the Fourteenth Amendment if there is a reasonable likelihood that, without the use of that evidence, the defendant

---

[8]     Mr. Thorpe does cite one case in which that court denied the defendant prosecutors' motion to dismiss a failure-to-intervene claim predicated on the prosecutors' acquiescence of others' fabrication of evidence through hypnosis and coerced confessions. *Fogle v. Sokol*, No. 17-194, 2018 WL 6831137, at *12 (W.D. Pa. Dec. 28, 2018) ("If a law enforcement officer's duty to intervene extends to an obvious use of excessive force in violation of the Fourth Amendment, it surely must follow *a fortiori* that it extends to the fabrication of evidence in violation of the Fourteenth Amendment's Due Process Clause."). However, that court did not assess whether clearly established law precluded an assertion of qualified immunity as to that claim. Instead, the court was tasked with determining whether dismissal was appropriate based on absolute immunity. Such an analysis does not engage in the two-pronged inquiry used for assessing assertions of qualified immunity.

would not have been convicted." *Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014). After all, "no sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence." *Id.* at 292-93.   To demonstrate this reasonable likelihood, "plaintiffs bringing fabrication claims must draw a meaningful connection between their conviction and the use of fabricated evidence against them." *Id.* at 294 n.19. The Third Circuit Court of Appeals has also acknowledged that "if fabricated evidence is used as a basis for a criminal charge that would not have been filed without its use the defendant certainly has suffered an injury." *Id.* In *Halsey*, the Third Circuit Court of Appeals noted that this stand-alone fabrication-of-evidence claim was clearly established prior to 1985. *Id.* at 295-96.

## 2. Withholding Evidence (*Brady*)

"A *Brady* violation occurs if: (1) the evidence at issue is favorable to the accused, because either exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.'" *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011). *Brady* suppression occurs where the government fails to turn over evidence that is "known only to police investigators and not to the prosecutor." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (per curiam) (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)). Officers must "affirmatively conceal material evidence from the prosecutor" to be liable under *Brady*. *See Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety*, 411 F.3d 427, 443 (3d Cir. 2005), *overruled on other grounds by Dique v. N.J. State Police*, 603 F.3d 181, 183 (3d Cir. 2010).

Evidence is considered to be *Brady* material "if it would tend to exculpate [the accused] to reduce the penalty . . . ." *Smith v. Holtz*, 210 F.3d 186, 195 (3d Cir. 2000) (citation omitted). Although "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense[,]" the failure to disclose evidence

23

constitutes a due process violation if the failure to disclose "undermines confidence in the outcome of the trial." *Id.* at 196. A police officer's *Brady* obligations have been clearly established since 1995. *See Thomas v. City of Phila.*, 290 F. Supp. 3d 371, 384 (E.D. Pa. 2018).

### 3. Fourth Amendment Malicious Prosecution

To plead a malicious prosecution claim under the Fourth Amendment, "a plaintiff must allege that (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Young v. City of Chester, PA*, 764 F. App'x 262, 265 (3d Cir. 2019) (citing *Zimmerman v. Corbett*, 873 F.3d 414, 418 (3d Cir. 2017)).

Police officers (as opposed to prosecutors) may be liable for malicious prosecution if they "conceal or misrepresent material facts" to the prosecutor. *Halsey*, 750 F.3d at 297 (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1292 (10th Cir. 2004)). In particular, an officer is liable if he "fails to disclose exculpatory evidence to prosecutors, makes false or misleading reports to the prosecutor, omits material information from the reports, or otherwise interferes with the prosecutor's ability to exercise independent judgment in deciding whether to prosecute." *Finnemen v. SEPTA*, 267 F. Supp. 3d 639, 644 (E.D. Pa. 2017) (cleaned up). As early as 1998, the Third Circuit Court of Appeals noted that "a § 1983 malicious prosecution claim might be maintained against one who furnished false information to, or concealed material information from, prosecuting authorities." *Gallo v. City of Phila.*, 161 F.3d 217, 220 n.2 (3d Cir. 1998) (citation and quotation marks omitted).

24

### 4. Civil Rights Conspiracy

A civil rights conspiracy claim requires "(1) [t]he existence of a conspiracy; (2) [a]n agreement or meeting of the minds to violate constitutional or civil rights; and (3) [a] deprivation of those rights in furtherance of the conspiracy." *Thomas*, 290 F. Supp. 3d at 386-87 (citing *Rosembert v. Borough of E. Lansdowne*, 14 F. Supp. 3d 631, 647 (E.D. Pa. 2014)). Where substantive § 1983 claims are permitted to proceed, the Third Circuit Court of Appeals stated in 2005 that "it follows that the 42 U.S.C. § 1983 conspiracy claim . . . may also proceed[.]" *Gibson*, 411 F.3d at 446; *see also Thomas*, 290 F. Supp. 3d at 387 (permitting a civil rights conspiracy claim to survive a motion to dismiss where the plaintiff alleged facts to plausibly suggest that an officer contributed to a false story about a murder).

### B. Claims Against Supervisory Defendants

The supervisory defendants—Lt. Riehl, Sgt. Hayes, and Sgt. McClane—argue that Mr. Thorpe failed to allege that they affirmatively directed Dets. Pitts or Scally to engage in unlawful actions or that they had knowledge of and acquiesced in such improper conduct. As noted, the Court finds that Mr. Thorpe has sufficiently pleaded plausible allegations demonstrating their engagement in, at the very least, the unlawful conduct of Dets. Pitts or Scally.[9] Because clearly established law made it clear at the time at issue that the alleged fabrication and withholding of evidence would have violated Mr. Thorpe's constitutional rights at issue, the Court declines their assertion of qualified immunity with respect to the fabrication-of-evidence, *Brady*, and Fourth Amendment malicious prosecution. Because these claims survive, "it follows that the 42 U.S.C. § 1983 conspiracy claim . . . may also proceed[.]" *Gibson*, 411 F.3d at 446.

---

[9]     Although the alleged unlawful conduct of all non-supervisory defendants is at issue, the supervisory defendants focus on their supervision of Dets. Pitts and Scally.

### C. Claims Against Det. Gaines

According to the amended complaint, Det. Gaines was involved in executing the search warrant and recovering items from the third-floor rear apartment. Det. Gaines also joined Dets. Pitts and Scally in interviewing Mr. Bytheway, where they either intentionally failed to report that Mr. Bytheway did not identify Mr. Thorpe in a photo array or that they never presented the photo array to him.

It is not clear to the Court which factual allegations Mr. Thorpe contends support his fabrication-of-evidence claim against Det. Gaines. During oral argument, Mr. Thorpe's counsel conceded that the allegations concerning Det. Gaines' alleged fabrication of evidence were strained, but suggested that perhaps discovery could reveal more information to substantiate such a claim. At the motion to dismiss stage, a claim should proceed so long as a plaintiff "allege[d] sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his or] her claims." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016). However, "discovery is not intended as a fishing expedition permitting the speculative pleading of a case first and then pursuing discovery to support it; the plaintiff must have some basis in fact for the action." *Zuk v. Eastern Pa. Psychiatric Inst. of Med. College of Pa.*, 103 F.3d 294, 299 (3d Cir. 1996). Without more, the Court will not conclude that Mr. Thorpe pleaded a plausible fabrication-of-evidence claim as to Det. Gaines.

Mr. Thorpe's *Brady* allegations as to Det. Gaines, however, fare better. Mr. Thorpe pleads that Det. Gaines failed to report that Mr. Bytheway did not identify him in a photo array. Det. Gaines argues that these allegations fail to support a plausible *Brady* claim because Mr. Thorpe only pleaded that Det. Gaines showed Mr. Bytheway a photo array and that he failed to identify Mr. Thorpe, without explicitly pleading that Mr. Thorpe's photo was included in the photo array.

Taking all inferences in Mr. Thorpe's favor, as it must at this stage, the Court can infer that Mr. Thorpe's photo could have been included in the photo array.

Det. Gaines also argues that the *Brady* claim against her is not plausible because Mr. Bytheway was not asked to make an identification at trial, and thus, the withheld material was "revealed at trial." Defs.' Mem. in Supp. of Mot. to Dismiss at 10 (Doc. No. 34). This argument misses the mark. Mr. Thorpe contends that the withheld material information at issue is the asserted fact that the detectives showed Mr. Bytheway a photo array and that he failed to identify Mr. Thorpe. Such information was not revealed at trial. Therefore, Mr. Thorpe pleaded a plausible *Brady* claim with respect to Det. Gaines. Because it was clearly established that a police officer ought not affirmatively conceal material evidence from a prosecutor in 2008, the Court rejects Det. Gaines' invocation of qualified immunity regarding this claim at this time.

Mr. Thorpe's allegation that Det. Gaines failed to report that Mr. Bytheway did not identify Mr. Thorpe in a photo array also supports a plausible Fourth Amendment malicious prosecution claim. Given that it was clearly established by 2008 that concealing material information from a prosecutor violates an individual's constitutional rights, the Court will refrain from approving Det. Gaines' assertion of qualified immunity with respect to this claim. Because the *Brady* and Fourth Amendment malicious prosecution claims survive the motions to dismiss, "it follows that the 42 U.S.C. § 1983 conspiracy claim . . . may also proceed[.]" *Gibson*, 411 F.3d at 446.

### D. Claims Against Det. Glenn

Det. Glenn was one of the detectives who executed the search warrant and recovered various items from the apartment. More importantly, Mr. Thorpe alleges that Det. Glenn, alongside Dets. Pitts and Cummings, misrepresented that neighbors communicated that Mr. Span's shooter lived in the third-floor rear apartment, even though no evidence actually connected the

27

shooter to that apartment. Based on this misrepresentation, the police were able to secure a search warrant for the apartment, where they found a photograph of Mr. Thorpe.[10] According to Mr. Thorpe, this misrepresentation also led the investigators to Ms. Stones and Mr. Chamberlain. Mr. Thorpe contends that the misrepresentation influenced the initiation of the prosecution and presentation of evidence at trial because it corroborated the connection between Mr. Thorpe and the crime as well as Mr. Robinson's identification of Mr. Thorpe as the perpetrator.

Det. Glenn contends that the misrepresentation that the third-floor rear apartment was associated with Mr. Span's shooter lacks a meaningful connection to Mr. Thorpe's conviction, and thus, it cannot form the basis of a plausible fabrication-of-evidence claim. Det. Glenn argues that this alleged misrepresentation never made its way into trial and is otherwise not sufficiently linked to the alleged coercion of witnesses to identify Mr. Thorpe as the shooter or to any statements made in support of his supposed motive. Mr. Thorpe hotly disputes Det. Glenn's contention that the misrepresentation did not make its way into trial, reasoning that the fabricated connection between the shooter and the third-floor apartment was incorporated into Mr. Chamberlain's statement, which he contends was a key piece of evidence leading to his conviction. At this early stage, it is plausible that the fabrication at issue was sufficiently connected to Mr. Thorpe's conviction to survive this Rule 12(b)(6) challenge.[11] When defined at the appropriate level of generality, "the right at issue in the present case is . . . the right to be free from the knowing use by a police officer of fabricated evidence in order to bring about an individual's arrest and criminal

---

[10] No items recovered pursuant to the search warrant were used at trial.

[11] The Court notes that although the fabrication at issue may have started a long chain of events eventually leading to Mr. Thorpe's conviction and added to the alleged taint running throughout the entire homicide unit, there exists a possibility that Mr. Thorpe's reliance on this fabrication alone could be too attenuated for the purposes of establishing a fabrication-of-evidence claim. Perhaps summary judgment would be a more appropriate opportunity for the Court to gauge the sufficiency of the connection between the fabrication and Mr. Thorpe's conviction.

charge." *DeLade v. Cargan*, No. 16-415, 2019 WL 1387704, at *30 (M.D. Pa. Mar. 27, 2019). Because a stand-alone fabrication-of-evidence claim was clearly established at the time in which the investigation and prosecution took place, the Court will deny Det. Glenn's assertion of qualified immunity as to the fabrication-of-evidence claim at this time.

Mr. Thorpe's *Brady* claim asserted against Det. Glenn largely follows his fabrication-of-evidence claim. Mr. Thorpe reasons that Det. Glenn withheld the fact that the identification of Mr. Span's shooter as living in the third-floor rear apartment was fabricated. At this time, the Court can infer that such a withholding of information could support a plausible *Brady* claim. Moreover, the Court rejects an assertion that qualified immunity bars such a claim given that officers knew not to conceal material evidence from a prosecutor at the time in question. For the same reasons the fabrication-of-evidence and *Brady* claims survive the Rule 12(b)(6) stage and Det. Glenn's invocation of qualified immunity, so do the Fourth Amendment malicious prosecution and civil rights conspiracy claims.

### E. Claims Against Det. Cummings

Det. Cummings, alongside Dets. Glenn and Pitts, allegedly misrepresented that neighbors identified the third-floor rear apartment as the shooter's residence and executed the search of the apartment. On the day of the shooting, when interviewing Mr. Robinson, Dets. Cummings, Pitts, and Scally either failed to ask or failed to record answers to interview questions which would have detailed key descriptive information about the shooter. They also failed to record or destroyed documentation concerning the photo identification procedure conducted with Mr. Robinson.

Because Mr. Thorpe alleges that Det. Cummings, alongside Det. Glenn, misrepresented that neighbors identified the third-floor rear apartment as the shooter's residence, the Court denies Det. Cummings' Rule 12(b)(6) challenge and invocation of qualified immunity as to the

29

fabrication-of-evidence claim against Det. Cummings for the reasons discussed above. *See supra* Discussion § III.D.

Mr. Thorpe bases his *Brady* claim against Det. Cummings on his alleged failure to record descriptive information provided by Mr. Robinson as well as his alleged failure to record and/or destruction of documentation concerning the photo array presented to Mr. Robinson on the day of the shooting. Assuming the veracity of the allegations that the detectives failed to record descriptive information provided by Mr. Robinson, presumably because the material did not implicate Mr. Thorpe, such conduct could support a plausible *Brady* claim. As for the allegations concerning the photo array, Det. Cummings argues that Mr. Thorpe did not explicitly allege that his photo was included in the array. As discussed above, however, such an argument fails to take all inferences in Mr. Thorpe's favor, as is required at this stage. *See supra* Discussion § III.C. Because it was clearly established that a police officer ought not affirmatively conceal material evidence from a prosecutor during the time at issue, the Court rejects Det. Cumming's invocation of qualified immunity with respect the *Brady* claim at this time.

Moreover, Mr. Thorpe's allegations concerning Det. Cummings' role in Mr. Robinson's interview support a plausible Fourth Amendment malicious prosecution claim. Given that it was clearly established at the time of the alleged unlawful conduct that concealing material information from a prosecutor violates an individual's constitutional rights, the Court rejects Det. Cummings' assertion of qualified immunity with respect to the Fourth Amendment prosecution claim. Because the fabrication-of-evidence, *Brady*, and Fourth Amendment malicious prosecution claims survive the motions to dismiss, "it follows that the 42 U.S.C. § 1983 conspiracy claim . . . may also proceed[.]" *Gibson*, 411 F.3d at 446.

30

## IV.    Fourteenth Amendment Malicious Prosecution Claims

The City and Defendants Gaines, Glenn, Cummings, Hayes, Riehl, McClane, and Scally request that the Court dismiss Mr. Thorpe's Fourteenth Amendment malicious prosecution claim. Because a malicious prosecution claim under the Fourteenth Amendment's procedural due process clause was not clearly established at the time period at issue, the Court dismisses this claim.

### A. Claim as to Defendants Gaines, Glenn, Cummings, Hayes, Riehl, McClane, and Scally

The moving individual defendants argue that Mr. Thorpe is barred from bringing a malicious prosecution claim under the Fourteenth Amendment; that Mr. Thorpe failed to plead a plausible malicious prosecution claim under the Fourteenth Amendment; and that the individual defendants are entitled to qualified immunity with respect to a Fourteenth Amendment malicious prosecution claim. The qualified immunity argument is dispositive. The Court recently addressed this very qualified immunity issue in *Thomas v. City of Philadelphia*, 290 F. Supp. 3d 371 (E.D. Pa. 2018), and sees no reason why it should veer from its previous ruling.

Neither party disputes that the Supreme Court held in *Albright v. Oliver*, 510 U.S. 266 (1994), that there is no *substantive* Fourteenth Amendment due process right to be free from malicious prosecution. Rather, at issue here is whether Mr. Thorpe has a *procedural* Fourteenth Amendment due process right to be free from malicious prosecution.

Mr. Thorpe contends that the Third Circuit Court of Appeals made clear in *Torres v. McLaughlin*, 163 F.3d 169 (3d Cir. 1998), that a plaintiff may base a malicious prosecution claim on procedural due process. In *Torres*, the Third Circuit Court of Appeals held that it does "not read *Albright* to hold that a malicious prosecution claim can only be based on a Fourth Amendment violation. Accordingly, a § 1983 malicious prosecution claim may also include police conduct that violates the Fourth Amendment, the procedural due process clause, or other explicit text of

31

the Constitution." *Id.* at 173. However, the Third Circuit Court of Appeals acknowledged in 2014 that it actually refrained from deciding in *Torres* whether a § 1983 malicious prosecution claim could be based in procedural due process.[12]

Given the unsettled posture of this inquiry, this Court in *Thomas* determined that "[t]he procedural due process right against malicious prosecution is not clearly established." *Thomas*, 290 F. Supp. 3d at 382; *see also id.* ("The Supreme Court has not yet articulated such a right. And the Third Circuit Court of Appeals stopped short of deciding the right's 'viability' in 2014, let alone in the early 1990s when Mr. Thomas interacted with the defendants."). Therefore, the individual defendants in *Thomas* were granted qualified immunity from a claim for malicious prosecution in violation of the procedural due process clause. *Id.* at 383. Other courts in this Circuit have followed suit. *See, e.g., Lewis v. City of Phila.*, No. 19-2847, 2020 WL 1683451, at *8 (E.D. Pa. Apr. 6, 2020) (citing *Thomas* and finding that individual defendants were entitled to qualified immunity because a procedural due process right against malicious prosecution was not clearly established at the time of the plaintiff's prosecution); *McCormack v. Livergood*, 353 F. Supp. 3d 357, 364 (M.D. Pa. 2018) (citing *Thomas* and granting qualified immunity to defendant with respect to plaintiff's malicious prosecution claim under the Fourteenth Amendment procedural due process clause); *Gilyard v. Dusak*, No. 16-2986, 2018 WL 2144183, at *5 (E.D. Pa. May 8, 2018) (citing *Thomas* and finding that qualified immunity barred plaintiff's Fourteenth Amendment due process claim "because in 1998 (and today) our courts had not clearly established a citizen had a Fourteenth Amendment procedural due process right to be free from malicious prosecution").

---

[12]    In a parenthetical the Third Circuit Court of Appeals noted that in *Torres* it "reaffirm[ed] that § 1983 malicious prosecution claims cannot be based on substantive due process but declin[ed] to decide whether they could be grounded in procedural due process." *Halsey*, 750 F.3d at 290 n.14.

Because a Fourteenth Amendment procedural due process right against malicious prosecution was not clearly established in 2008—and is still not clearly established for that matter—the Court grants qualified immunity as to this claim on behalf of all moving individual defendants.

### B. Claim Against the City

Mr. Thorpe brought Count II alleging malicious prosecution in violation of the Fourth and Fourteenth Amendments exclusively "[a]gainst all [i]ndividual [d]efendants[,]" not the City. Am. Compl. at p. 42 (Doc. No. 33). Accordingly, the Court deems moot the City's request to dismiss a Fourteenth Amendment malicious prosecution claim against it. Regardless, both parties addressed whether Mr. Thorpe can bring a Fourteenth Amendment malicious prosecution claim against the City in their briefing and during oral argument. For the sake of thoroughness, the Court has considered the parties' arguments even in the absence of such a claim. Therefore, even if Mr. Thorpe brought a Fourteenth Amendment malicious prosecution claim against the City, such a claim would be dismissed because the City is entitled to qualified immunity.

To hold a municipality liable under § 1983, a plaintiff must "identify a municipal policy or custom that amounts to deliberate indifference to the rights of people with whom the police come into contact." *Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir. 2004). The City argues that Mr. Thorpe cannot show that the City was deliberately indifferent to its officers' misconduct. Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)). As this Court noted in *Thomas*, several courts have held that a municipality cannot be deliberately indifferent to a right that is not clearly established. *See Szabla v. City of*

33

*Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007) ("[A] municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established."); *see also Townes v. City of New York*, 176 F.3d 138, 143-44 (2d Cir. 1999); *Williamson v. City of Virginia Beach*, 786 F. Supp. 1238, 1264-65 (E.D. Va. 1992); *Zwalesky v. Manistee Cty.*, 749 F. Supp. 815, 820 (W.D. Mich. 1990).

Because a Fourteenth Amendment malicious prosecution claim was not clearly established during the time period at issue, the Court declines to allow such a claim to proceed.

## V.    Malicious Prosecution Claim Under Pennsylvania State Law

Mr. Thorpe brought a malicious prosecution claim under Pennsylvania law against all the defendants. In his response in opposition to the first motion to dismiss, Mr. Thorpe agreed that his state malicious prosecution claim as to the City should be dismissed. Accordingly, the Court will not further entertain the plausibility of the state malicious prosecution claim as it pertains to the City. Mr. Thorpe, however, maintains that his state malicious prosecution claim with respect to the moving individual defendants should survive.

Despite moving to dismiss all claims against them, Defendants Gaines, Glenn, Cummings, Hayes, Riehl, and McClane did not articulate an argument concerning the state malicious prosecution claim against them until the Court ordered supplemental briefing. In their supplemental briefing, the moving individual defendants argued that the Pennsylvania Political Subdivision Tort Claims Act grants municipal officers acting in their official capacities immunity from liability for state law tort claims. *See Holloway v. Brechtse*, 279 F. Supp. 2d 613, 616 (E.D. Pa. 2003) (citations omitted).

However, individual police officers "are not immune from liability under § 8545 where their conduct amounts to 'actual malice' or 'willful misconduct.'" *Madero v. Luffey*, No. 19-700,

34

439 F. Supp. 3d 493, 511 (W.D. Pa. Feb. 13, 2020) (citing *Sanford v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006)). "Willful misconduct has been defined by the Pennsylvania Supreme Court as conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such a desire can be implied. Otherwise stated, the term willful misconduct is synonymous with the term intentional tort." *Id.* (quoting *Sanford*, 456 F.3d at 315) (internal quotation marks omitted); *accord Brown v. Muhlenberg Twp.*, 269 F.3d 205, 214 (3d Cir. 2001).

For the same reasons the Court finds that Mr. Thorpe has pleaded plausible claims against Dets. Gaines, Glenn, Cummings, Sgts. Hayes and McClane, and Lt. Riehl, the Court determines that Mr. Thorpe has plausibly pleaded the willful misconduct of the moving individual defendants. Therefore, the Court refrains from dismissing the state malicious prosecution claim against these defendants at this early stage.

## CONCLUSION

For the foregoing reasons, the Court grants in part, denies in part, and deems moot in part the motion to dismiss filed by Defendants Gaines, Glenn, Cummings, Hayes, Riehl, McClane, Scally, and the City and grants in part and denies in part the motion to dismiss filed by Det. Cummings. Specifically, the Court dismisses (i) Mr. Thorpe's failure-to-intervene claim as to Defendants Gaines, Glenn, Cummings, Hayes, Riehl, and McClane; (ii) the Fourteenth Amendment malicious prosecution claim as to Defendants Gaines, Glenn, Cummings, Hayes, Riehl, McClane, and Scally; (iii) the state malicious prosecution claim with respect to the City; and (iv) the fabrication-of-evidence claim as to Det. Gaines. The Court finds permitting an additional opportunity at amendment as to these claims to be futile. *See Phillips*, 515 F.3d at 236. Moreover, the Court deems moot the City's request to dismiss a Fourteenth Amendment malicious

35

prosecution claim against it because that claim was not actually asserted against the City.[13]   The remainder of the claims at issue in the motions to dismiss remain.   Finally, the defendants' assertions of qualified immunity are denied without prejudice.   An appropriate order follows.

BY THE COURT:

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**

---

[13]      To the extent Mr. Thorpe seeks to assert such a claim, however, it would fail and be dismissed.